# JAMES TILLINGHAST, Administrator, v. BENJAMIN A. HOLBROOK.

In an act of the General Assembly enabling a married woman who was under age to join with her husband in the sale of certain of her real estate, there was a proviso, " that the proceeds of said sale be invested in a promissory note, fully secured by mortgage, payable to said Emily, (the wife,) or order, on the 1st day of September, A. D. 1857, with interest from date, to be paid annually to said Emily, for her sole and separate use; and, also, *provided*, that said proceeds invested as aforesaid, or otherwise, *shall descend and be inherited* in the same manner as the said real estate would have descended and been inherited." In trover for the note by the administrator of the wife against the purchaser, into whose possession it had got during the life of the wife, *it was held*, that the act was not designed by the last proviso to prevent the succession of the wife's administrator to the note and to give it to her heirs, but merely to designate that the same class of heirs, under the ancestral clause of the statute of descents, should be entitled to distribution of the proceeds of the note as would have inherited the real estate, had it never been converted into personalty.

The note given by the purchaser under the act, is no more within the power of the infant wife, either to transfer, or to receive payment of, by anticipation of the day of payment, than any other note would be within the power of a person under such disabilities, the act not enabling her in those respects; and where the wife had, whilst still an infant, separated from her then husband, and with her infant child lived with another man in a house of bad repute, and had endorsed the note to him, who parted with it to the purchaser before it became due, and the wife died during infancy, *it was held*, that her administrator might repudiate the transfer and payment of the note, and in an action of trover recover the value of the note from the purchaser, who had refused to deliver it up to the administrator upon demand.

Being also a married woman, the payee of this note, which was secured by mortgage, could not, although it was her separate property, transfer or dispose of the same, except by a conveyance executed in conformity to Ch. 136, section 4, of the Revised Statutes, to wit, by herself and her husband, and acknowledged by her apart from her husband.

The rule of damages in the action of trover in such case is, the amount of the note with interest, deducting only the annual interest proved to have been paid by the purchaser to her for her use, and such sums as he may have, by advance, applied in furnishing necessaries for the support of herself and child.

In case of such adulterous separation of a wife from her husband, she having separate property, the court of probate of the town in which she resides may, under the third section of the act contained in the Digest of 1844, page 272, upon the application of her father and husband and upon due notice and proof, appoint a guardian of her person and estate, upon the ground that she is a person who, for want of discretion in managing her estate, was likely to bring herself and her family to want, and thereby render herself chargeable to said town; and during the continuance of such guardianship, all transfers by her of her property are absolutely void.

TROVER for a note of $2000, the declaration containing counts which laid the conversion as well before, as since, the death of the plaintiff's intestate.

At the trial of the case before the Chief Justice, with a jury, at the March term of the court, 1861, for the county of Providence, under the general issue, it appeared, that Emily A Olney, the plaintiff's intestate, formely the wife of Thomas J. Simmons, was, in 1852, the owner of certain real estate in North Providence, and being under age, upon the petition of herself, and Simmons, her then husband, in which her father, Edmund A. Brown, joined, the General Assembly, at their October session, 1852, passed the following act, enabling her and her husband to sell the same :—

" Upon the petition of Thomas J. Simmons and his wife, Emily Simmons, and of Edmund M. Brown, father of said Emily,. all of the City of Providence, praying for reasons therein stated, that the said Emily, yet a minor, be empowered to convey certain lands to her belonging, with the same effect as if she had attained her full age,—

"*Voted and resolved,* That the prayer of said petition be granted; that the said Thomas J. Simmons and Emily Simmons be, and are, hereby authorized and empowered, notwithstanding the minority of the said Emily, to make sale and conveyance, with the usual covenants and warrants, to Benjamin A. Holbrook, of Providence, of the lands following, viz.: (here follows a description of the lands) ; and that a deed or deeds of said lands to said Holbrook, made and executed by said Thomas J. and said Emily, in the form and manner prescribed by law for the conveyance of real estate of which the fee is vested in a married woman, shall be as valid and effectual in law to convey the same, as if the said Emily Simmons had attained her full age. *Provided, however,* that the proceeds of said sale be invested in a promissory note, fully secured by mortgage, payable to said Emily or order on the first day of September, A. D. 1857, with interest from date to be paid annually to said Emily, for her sole and separate use ; and also *provided,* that said proceeds invested as aforesaid or otherwise, shall descend and be inherited in the

same manner as the said real estate would· have descended and been inherited."

Under the power given by this act, the estate was sold by Simmons and his wife to the defendant, and his promissory note for $2000, dated November 17th, 1852, was given to Emily Simmons, payable to her, or order, five years after date, with interest annually, and was secured by mortgage upon the estate sold. · Upon her death the plaintiff was appointed her administrator, and on the 1st day of February, 1858, having demanded the note of the defendant in whose possession it was, who refused to deliver it to him, brought this action against the defendant for his conversion of it.

· Upon this evidence, the Chief Justice nonsuited the plaintiff, upon the ground, that by the terms of the act of the General Assembly produced, the note, upon the death of Emily Simmons, afterwards Olney, passed to her heirs at law, and not to the plaintiff, her administrator, and that he had no right to demand or sue for the same.

A motion was now made by the plaintiff to set aside the nonsuit as improperly ordered, and to grant to him a new trial.

· *James Tillinghast, with whom was Bradley, pro seipso,* cited, *Wells* v. *Bowling,* 2 Dana, 41; *Borneman* v. *Sedlinger,* 6 Shep. (18 Maine,) 225, 227; *Wells* v. *Coales,* 4 Conn. 182.

*Thurston, for the defendant.*

BRAYTON, J. The plaintiff in this case was nonsuited, on the ground that, upon the conceded facts, he could not maintain an action for the note, and because the title to it had passed, before suit brought, to the heirs of the intestate, to whom it was payable, and not to her administrator.

The general rule is, that in order to maintain trover there must be in the plaintiff, at the time of suit brought, a property in the goods; and that when the whole interest in the property converted passes, after the alleged conversion and before suit brought, to another person, and there be no special damage to the original owner, his right of action is gone. *Philips* v. *Robinson,* 4 Bingh. 106; 12 Moore, 368; *Harrington* v. *Price,* 3 B. & Ad. 170. It must be shown that there has been damage to the personal pro-

perty, or estate of the party, in his own hand while living, or in that of his executor or administrator, when dead ; and the question here is, if, by the conversion, damage resulted to the personal estate of the intestate in her lifetime, or, since her death, to her estate in the hands of her administrator.

The property alleged to have been converted is personalty, and not realty ; and by the rule of succession would, on the death of the intestate, pass to her administrator ; and any suit for its conversion, either in the lifetime of the intestate or after her death, must be brought in the name of such administrator. The note, in this case, was given by the defendant for the proceeds of certain real estate of the intestate, which she, being within the age of twenty-one years, was incompetent to convey. To enable her to do so, and to vest a good title in the purchaser, an act of the General Assembly was passed at the October session, 1852, empowering her, with her then husband, to make sale of the estate to the defendant. The authority to convey was granted upon this condition,—that the proceeds of the sale should be invested in this note, secured by mortgage, and payable to the intestate ; and also, " provided, that said proceeds invested as aforesaid, or otherwise, shall descend and be inherited as the said real estate would have descended and been inherited."

It is claimed, that the moneys secured by this note, being the proceeds of the real estate sold and the note by which the payment is secured, passed immediately on the death of the intestate to such of her heirs at law as would have inherited from her the real estate, and not to her administrator. Had the land remained, and the owner died intestate, it would have passed to such of her heirs, by the table of descent, as were of the blood of the person from whom it came to her by gift or descent. Upon the conveyance, however, it became converted into personalty, as which, it is provided, that it shall be " distributed amongst the heirs of the deceased in the same manner real estates descend and pass ;" " but without any respect to the blood of the person from whom such personal estate came or descended." These proceeds, then, might, by the provisions of law, have gone to heirs of the intestate other than those to whom the land would have passed, viz. : to such of them as had none of the blood of the person from whom

the land came. The purpose of this proviso evidently was, to prevent such result, and to provide that the moneys into which the land had been converted, notwithstanding such conversion, should go to the same persons to whom the land would have gone, if no such authority to convert had been granted by the General Assembly. The language of this proviso requires, that the proceeds of sale shall not pass to the heirs generally, but in ascertaining the heirs, respect shall be had to the blood of the person from whom the land came, if any persons of that blood remain. To whom the moneys are ultimately to go is sufficiently certain; the more important question is, at what time the legal interest passes to the heirs, whether directly and immediately, on the death of the intestate, or mediately, to the same heirs, in the course of distribution. In either mode the object of the proviso is answered, and that equally. The last mode would not, as the first would, require us to disregard the statute provisions in regard to mortgages held by deceased persons. They provide, that money due by mortgage of real estate shall be considered personal property, and be included in the inventory as assets; that the administrator shall have the same control of the interest of the real estate mortgaged as he would of personal estate mortgaged; that he may take the surrender of possession, or sue in ejectment for the seizin and possession of the real estate, and shall hold the possession to the use of the heirs, or of the devisee to whom it may be devised. He may sell it for the payment of debts, and if the mortgagor redeems after possession taken, he shall receive the redemption money for distribution or payment to the devisee, and may discharge the mortgaged premises by release, quitclaim, or other legal conveyance. To require a disregard of all these provisions, the language ought to be strong, and this construction become necessary in order to give effect to the words. All these provisions, however, may well enough be regarded and held applicable to the present note and mortgage, without diverting the mortgage money from those heirs who may be of the blood of the person from whom the land came. If held not applicable, and the proceeds to pass, not to the administrator but directly to the heirs, it would be doubtful, at least, if within any of the provisions of law they could, as personalty, be applied to the payment

Tillinghast, administrator, *v.* Holbrook.

of the debts of the intestate, even for want of general personalty for that purpose.

The language of the proviso does not, in our judgment, require this construction. Had the legislature never applied the terms "descend" or "inherit," and the term "heirs," to the succession by law to other than real estate, the language would have been more controlling, and the implication much stronger of an intent to impress upon this fund the character, and to give it all the incidents, of realty. In the public act we find the terms not so limited; on the contrary, personalty is to be distributed to heirs, and in the same manner as real estates descend; and in that distribution, no inquiry need be made from whom the personal estate descended,—implying that it might *descend*, though it came by distribution. In no case, however, was it implied that the legal title was to pass, not to the administrator, but directly to the heirs. The word "inherit" being correlative in meaning with the word "descend," we may presume was used in the same sense, and does not strengthen the language in this respect. Regarding, then, the language of the public act in this respect, it seems sufficient, in order to give effect to the words and to the object and purpose of the proviso, to hold, these proceeds, and the note and mortgage, to be what the statute declares mortgages of real estate shall be,—part of the personal property of the deceased, to be included in the inventory,—and giving the right to the administrator to sue for the debt secured, or for the possession of the estate mortgaged; but, nevertheless, that the proceeds of sale shall not pass to any others of the heirs of the intestate than such as are of the blood, &c., while any heirs of that blood remain. This is the only incident of realty which the proviso seems to have impressed upon this fund. The only purpose or necessity for the provision at all was, to provide for the succession of such heirs, if any such there should be; and if that blood failed, it never could have been the purpose to take this property out of the regular course of distribution.

*The nonsuit ordered in this suit must be set aside, and a new trial granted, the defendant, in any event, to recover no costs of this motion.*

AT the March term of the court, 1862, the new trial of the case was had before Brayton, Justice, with a jury, when, in addition to the facts reported as proved at the first trial, it appeared, that the said Emily A. Simmons was born on the first day of September, 1835, and had just reached her seventeenth year when authorized by the General Assembly to sell her real estate as aforesaid, and to receive therefor the note and mortgage of the defendant; that in the month of May, 1853, she procured a divorce from her husband, Simmons, and shortly afterwards intermarried with Hiram A. Olney. Being a person of loose habits, she afterwards separated from her second husband, Olney, and with her child, took up her residence with one Nehemiah Bucklin, whose house was a disreputable one. Whilst thus living apart from her husband, an infant and a married woman, the Municipal Court of the City of Providence, exercising probate jurisdiction, on the thirteenth day of March, 1855, on the application of her husband and of her father, and after due notice and upon full hearing, appointed Stephen Martin of Providence her guardian, adjudging that she, for want of discretion in managing her estate, was likely to bring herself to want, and thereby to render herself chargeable to the City of Providence. Martin duly qualified himself for his trust, and a letter of guardianship issued to him out of said court, but he never obtained possession of said note and mortgage, which remained in the hands of the said Emily A. Olney, his ward. From time to time, the defendant, Holbrook, paid to her the interest as it became due on said note, and, upon her order, different sums of money, and, finally, in June, 1855, paid in full all that, deducting such former payments, was computed to be due upon the note, to the said Nehemiah Bucklin, who then held the same.

Evidence was also submitted to the jury tending to prove that the said Emily A., whilst she and her child were living with said Bucklin apart from her husband and against the request of her guardian, and shortly before the transfer of this note, received the sum of four hundred dollars, which was at once squandered away; and that whilst there, she endorsed the note over to said Bucklin, the consideration of the transfer, in part, being the board of her-

Tillinghast, administrator, v. Holbrook.

self and child for about four months, and some money paid by Bucklin to her at the time of the transfer. In August, 1855, Emily A. Olney died, being a little less than twenty years of age. The plaintiff was duly appointed administrator on her estate, and on the first day of February, 1858, demanded this note of the defendant, who refused to deliver to him the same.

At the trial, the counsel for the defendant requested the court to instruct the jury, that the note sued for was lawfully in the possession of the defendant, if they were satisfied from the evidence that he had paid a valuable consideration therefor; but the court refused so to instruct them, and charged them, if they believed, from the evidence, that the said Emily A. Olney was a minor at the time she parted with said note, and if they also believed that she died before attaining her majority, that her transfer of said note might have been avoided by her in her lifetime, and her representative, the present plaintiff, was entitled to avoid the same.

The counsel for the defendant also requested the court to instruct the jury, the note in question having come to the hands of the defendant through one Nehemiah Bucklin, for a valuable consideration, and it also appearing that the same was secured by a mortgage given by the defendant to the said Emily A., in conformity with the act of the General Assembly, passed at the October session, A. D. 1852, that if the jury found that the defendant paid a valuable consideration for said note, he was lawfully entitled to hold the same against the plaintiff. This instruction the court refused to give; but, on the contrary, charged the jury, that the note in question was a mortgage debt; and if they found that the said Emily A. was, at the time she parted with said note, the wife of Hiram A. Olney, and that he was then living, the defendant could acquire no title to the note, or right to hold the same against the plaintiff, unless the same was conveyed by a deed executed by the said Hiram A. and Emily A., his wife, in conformity to the provisions of Ch. 136, section 4, of the Revised Statutes.

It having appeared, that at the time the defendant became possessed of said note, the said Emily A., wife of the said Hiram A. Olney, had been, by a decree of the Municipal Court of the

City of Providence, placed under the guardianship of Stephen Martin, who.had duly qualified himself to act in said trust, the court, at the request of the plaintiff, and against the objection of the counsel of the defendant, instructed the jury, that the said Emily A., though a married woman, could be legally placed under the disability of guardianship, for the cause stated in said decree ; and if the jury found that she parted with and endorsed said note, whilst under that disability, the defendant, claiming under such endorsement, was not entitled to hold the note against the plaintiff.

The counsel for the defendant further requested the court to instruct the jury, it having appeared that a portion of the consideration money paid by the defendant for said note was received by the said Emily A., she being within the age of twenty-one years, and a certain other portion of it was beneficially enjoyed by her in the way of board for herself and child for a period of four months, that if Emily A. Olney were alive, and after arriving at full age elected to avoid her transfer of the note, and commenced an action against the defendant to recover possession of the same, she would not be permitted to recover any greater amount of damages than the difference between the sum which she had so received and the amount of the note and interest from the time of the conversion; and if the jury believed the evidence as to the sum of money and other valuable considerations which she had received for said note from the defendant, the plaintiff, her administrator, had no greater rights than his intestate ; and the jury should deduct from the amount of the note, with interest from the time it came into the hands of the defendant, the sum which, under the evidence, the jury believed that she had received.   The court declined to give this instruction, but charged the jury, that in assessing the damages, they might deduct from the amount of the note and interest all sums paid to the said Emily A. for the annual interest on said note ; and if she had.been furnished with articles for the use of herself and child, and such articles were a part of the consideration for the transfer of said note, and the jury were satisfied, from the evidence, that the supplies furnished her were actually necessary for her or their use under the circumstances

proved, the amount of such supplies should be also deducted from the amount of the note ; that when money has been furnished to an infant, in order to charge him or her with the payment of it, it is necessary that it should appear from the evidence that it has been applied to the procurement of necessaries ; and that if they found evidence to satisfy them that any money had been so supplied to the said Emily A., the amount so found might also be deducted.

Under- these instructions, the jury having returned a verdict for the plaintiff for the sum of $2806.66, the defendant now moved for a new trial, upon the ground of errors in law in said instructions.

*Thurston & Ripley, for the defendants* :—

I. The court erred in instructing the jury, as in the first cause of error is assigned. 1. This act of Mrs. Olney, in parting with the note, so far as the defendant is concerned, was not a contract either void or voidable. By the act of the General Assembly, the note was expressly made payable to her, or her order, and the defendant could not have been called upon for payment until the expiration of five years, but he was not debarred from paying it sooner ; and if he could pay it to Mrs. Olney, he could also pay it to any endorsee ; for the character of negotiable paper is given to it by the act of the General Assembly. 2. So far as the defendant was concerned, he made no contract or bargain with Mrs. Olney; he simply paid his debt, and took up the evidence of it. If the plaintiff's theory is correct and the ruling of the court sound, the defendant would be responsible to Mrs. Olney's administrator after he had paid the money to Mrs. Olney herself, on the principle that a debtor cannot make payment to a minor. 3. The endorsement of the note to Bucklin by Mrs. Olney, and the payment of the note by the defendant, were upon the same day. Although the note had been previously pledged to Bucklin, Mrs. Olney received full value for it from Bucklin, from anything that appears to the contrary in the evidence ; and the defendant paid the full amount due upon it to Bucklin, so that, in substance, the payment of Holbrook was made to Mrs. Olney. 4. It is conceived that if it be held by the court, that the transfer to Bucklin of the note was a voidable act, then the remedy of the

plaintiff should be pursued against Bucklin, and not against the defendant, who was only discharging an obligation. 5. Assuming that the transfer to Bucklin and the payment of the note by the defendant were acts which Mrs. Olney, on account of her minority, could repudiate, then the further question, of the assent of the plaintiff to the act of his intestate, should have been submitted to the jury, in view of the lapse of time before any step was taken to recover the note. 2 Kent's Com. 237, and cases cited ; 1 Am. Lead. Cases, notes, 254.

II. The court erred in the second particular assigned, in instructing the jury that a married woman cannot transfer a mortgage debt except by deed executed by herself and her husband jointly, and acknowledged by her separately. See Dig. of 1844, p. 270, § 2. The section referred to is aimed against husbands who seek to dispose of their wives' property. It ought not to be construed to prevent a debtor from paying his debt to a *feme covert*, or even to debar her from legally parting with a mortgage debt, if she chooses so to do.

III. The court erred in the third particular assigned. 1. The act of the Municipal Court of Providence, placing a guardian over the person and property of a married woman was a void act, and no disability accrued to Mrs. Olney in consequence. 2 Kent's Com. 226. In *Roach* v. *Garvan*, 1 Ves. Sen. 157, the Chancellor said, that marriage *ipso facto* did not determine the guardianship, though the court could never appoint a guardian to a female infant under coverture. Reeves, on the Domestic Relations, 328, says :—" Marriage by a ward in all instances affects the rights of a guardian more or less. If a female ward marry, the guardian's power must cease both as it respects her person and her property. This, I apprehend, has never been questioned when she married an adult, for such husband has a right to her person, with an uncontrollable right to her property." The office of a testamentary guardian determines on the marriage of a female ward. *Mendes* v. *Mendes*, 1 Ves. Sen. 89. 2. The unreasonableness and inconsistency of such a power is manifest from the fact, that, by the theory of the law, husband and wife are one and indivisible. During the coverture the wife is *sub potestate viri*, and it is not competent for him to delegate the custody of her person

and the disposition of her property, to another. 3. This court has power to interpose between husband and wife, and appoint a trustee ; but if courts of probate can do this, the provisions of the law conferring this power on this court are a nullity. 4. But under the statute, the court of probate has no power like this. Their authority is limited (Rev. St. Ch. 138, §7) to a case where the individual is liable to bring himself to want. Now, in the proceedings in this case, it is asserted that Mrs. Olney is the wife of Hiram A. Olney; no suggestion is made that he is liable to bring himself to want; and as the wife cannot be in danger of being chargeable so long as the husband is in no danger of becoming so, there was nothing in this case, within the statute, for the court to do.

IV. The court erred in the fourth particular assigned. The privilege of minority is a shield, and not a sword. Upon the avoidance of a contract on this account, it is obligatory, both at law and in equity, upon the minor, to restore all that he has received. In this case, she had received from Bucklin four months board, and the balance, in money ; she had also received divers sums of money from the defendant, exhibited by receipts produced by the defendant ; and the jury should have been instructed to allow all such sums so proved, and ought not to have been restricted to the consideration of those items only, which were absolutely necessary for her support. 2 Kent's Com. 240 ; *Badger* v. *Phinney*, 15 Mass. 359 ; *Kitchen* v. *Lee*, 11 Paige, 107 ; *Smith* v. *Evans*, 5 Humph. 70 ; *Breed* v. *Judd*, 1 Gray, 455 ; *Hillyer* v. *Bennett*, 3 Edw. Chan. 222 ; *Taft & Co.* v. *Pike*, 14 Verm. 405 ; *Willis* v. *Twambly*, 13 Mass. 204 ; 1 Am. Lead. Cases, notes, p. 260, (4th ed.) and cases cited.

*James Tillinghast, with whom was Bradley, for the plaintiff :*

The *first exception* cannot be sustained. The instruction was, certainly, sufficiently favorable to the defendant. The act of Mrs. Olney in parting with this note, if not entirely void as we submit, was, under the circumstances, clearly voidable by her as a minor, and having died under age, the plaintiff is equally entitled to avoid it, in behalf of her estate. See 2 Kent's Com. 234, &c. ; *Willis* v. *Twambly*, 15 Mass. 204 ; Bingh. on Infancy, (ed. of 1849,) 49, n. 1, and cases cited.

*Second exception.* The instruction was correct. Our statute concerning the property of married women, itself stands in the place of the trust conveyance for her benefit, provided by the statutes of other states. She has, therefore, no powers over the estate, except those given her by the statute. Compare *Metcalf* v. *Cook*, 2 R. I. 355. The statute gives her no power to convey, except by deed. Rev. St. Ch. 136, § 4 ; Stat. of 1844, p. 270, § 2. Any other construction of the statute would enlarge the wife's power over her estate to the destruction of the husband's rights therein, as secured by the act. For, apart from the statute, at common law, the title to this note could be passed only by the endorsement of the husband, made by himself or by his agent duly authorized,—the only difference, in case the wife acts as agent, being, that *possibly* (but of this *quere ?* the cases are conflicting) she may, in case of such a note as this, payable to her own order, make the endorsement in her own name ; but it still operates as the husband's endorsement, not as hers. Her own endorsement made, as in this case, without his authority, is entirely void ; in this all the cases agree. *Barlow* v. *Bishop*, 1 East. 432 ; *Miller* v. *Delamater*, 12 Wend. 433 ; *Savage* v. *King*, 17 Maine, 301 ; 1 Parsons on Contracts, 212. When, therefore, the statute takes away from the husband this right to make title by his endorsement, it equally takes away the power of the wife to do so ; and title can only, therefore, be made in the prescribed statute form, *i. e.*, by the deed of both.

*Third exception.* The probate guardianship over Mrs. Olney, as a person liable to bring herself to want, &c., under the statute, was valid, particularly as our statute secures to her, separate property, and the guardianship was granted at the request of her husband. It is similar to the well settled jurisdiction of the English Chancery over lunatics, though married women. See Stock on Law of Non. Comp. 95–122 ; *In re Tomlinson*, 1 Vesey & Beames, 57 ; *In re Hewson*, 13 Eng. Law & Eq. 197.

*Fourth exception.* This instruction was sufficiently favorable to the defendant. See Bingh. on Infancy, 29, 30, and n. C.

BRAYTON, J. The first ground assigned for a new trial is, that the jury were misdirected in this :—That they were charged

that the intestate, an infant at the time of her death, might, during her life, have avoided her act in parting with the note in question, and that her representative, the present plaintiff, was entitled to avoid it after her death.

All contracts of an infant are, as a general rule, and, as it is said, almost as a universal rule, voidable; and may be avoided by him. See 1 Am. Lead. Cases, 248, and cases cited by the defendant; 3 Bac. Ab. 141; *Hedgeley and wife* v. *Holt*, 4 C. & P. 104. The negotiation of a promissory note was avoided in *Nightingale* v. *Withington*, 15 Mass. 272; and all the cases cited by the defendant recognize the right of the infant to avoid, at his election. It is equally well settled, that if the infant die within age, not having avoided the contract, it may be avoided by his representative. *Oliver et al.* v. *Houdlet*, 13 Mass. 237; *Slocum* v. *Hooker*, 13 Barb. 536; *Roberts* v. *Wiggin*, 11 N. H. 73; *Smith* v. *Mayo*, 9 Mass. 62. This right is not affected by the act of the General Assembly authorizing the sale of the real estate, and the taking of the security for the purchase money. That act does not profess to remove any disability under which the intestate then was, either of infancy or coverture, further than was necessary for the sale and conveyance of the real estate, and securing the proceeds of the sale for her and her heirs. Regarding the act of the defendant, in the view suggested by counsel, as a payment by him of a debt in anticipation, and before it fell due by the terms of the contract, it cannot defeat the right to avoid the act of the infant in transferring the note.

The defendant knew all the disabilities of the original payee of this note. He is the maker. He knew that he was paying (if we regard the payment made to her, and the payments to Bucklin as made to her) to an infant, and that he paid at his peril. If it were a legacy to be paid, and the defendant had paid it to an infant, the payment would have been void. *Philips* v. *Paget*, 2 Atk. 80, where the executor was compelled to pay a second time; and *Sparhawk* v. *Buel*, 9 Verm. 41, where payment of a legacy to a minor was held void. The rule is not confined to legacies. In *Hedgeley and wife* v. *Holt*, 4 C. & P. 104, the suit was for the wages of a servant, the plaintiff's wife, an infant. The defence was, that she had been paid,—part in money paid

for dresses, and the residue, moneys generally ; and Bayley, J., said,—" Payments made for necessaries, and which could not be avoided, are valid payments ; but infants cannot bind themselves for things not necessary;" and the plaintiffs were allowed to recover, deducting only moneys applied to purchase dresses, holding, in effect, that the other payments were void. There is no case cited by the defendant which affirms that payment of money to an infant is valid, even when payable by the terms of the contract. The payment here claimed was not in performance of the original contract, but involved the discharge of it by a new agreement.

This note was made payable to the intestate, after she should have arrived at full age,—the interest to be paid to her annually, for her separate use. It was secured by mortgage. As a ground for a new trial, the defendant complains and says, that the instruction to the jury, that she, being a married woman, could not transfer this note, unless in the mode prescribed in Ch. 136, section 4, of the Revised Statutes, viz., by deed of her husband and herself, acknowledged by her apart from her husband, was erroneous. Independent of the above act, entitled "An act concerning the property of married women," the endorsement of a *feme covert* would pass no interest in the note, and would not enable the endorser to maintain an action in his own name thereon. The property vesting in the husband, he becomes solely entitled to negotiate it as holder, and to endorse it in his own name. Story on Bills, § 196, Chit. on Bills, 25 ; *Barlow* v. *Bishop*, 1 East. 432. The act referred to does not enlarge the power of a married woman in this respect. It does not, by its terms, clothe her with the powers of a *feme sole*, or authorize her to sell or transfer, or to sue for or recover any of her property, without joining her husband. As to actions, it is expressly provided, that the husband shall join ; and had a suit on this note been necessary in the intestate's lifetime, it must have been in the name of husband and wife. For her security, the act has put a restraint upon the husband's power over certain kinds of property of the wife, and among them, debts secured by mortgage. These are so far secured to her sole and separate use that they cannot be taken for the husband's debts ; nor can they be sold, leased, or conveyed by the husband, " unless by deed in which the wife shall join as grantor," and

acknowledged by her, as in case of the real estate of a married woman. This is now the only mode in which the husband can dispose of a debt of the wife secured by mortgage. This restraint upon the husband does not empower the wife to act alone, and to transfer it in her own name ; and as he can only do it in the mode prescribed, she can only do it by joining him in that mode.

The third section of the act respecting guardians, contained in the Digest of 1844, p. 272, provides, that " whenever any idiot, or lunatic, or person *non compos mentis*, or any person who, for want of discretion in managing his estate, shall be likely to bring himself and family to want, and thereby to render himself and family chargeable, shall reside or have a legal settlement in any town, the court of probate of such town shall have the right to appoint a guardian of the person and estate of such person." The Municipal Court of the City of Providence, exercising probate jurisdiction, upon the application in writing of Hiram A. Olney, her husband, alleging that the said Emily, his wife, was, for want of discretion in managing her estate, likely to bring herself and family to want, and thereby to render herself and family chargeable, upon hearing, after legal notice to her, adjudged the complaint to be true, and thereupon appointed one Stephen Martin guardian of her person and estate, who accepted the appointment, and qualified himself to act by giving the required bond. The application did not allege that her husband was unable to support her, or that he was spending his estate, or likely to come to want, and become chargeable. Section tenth of the same act provides, that " all contracts, bargains, and conveyances, made by any person under guardianship, shall be utterly void."

One of the questions raised by the motion for a new trial is, whether a married woman can be legally placed under guardianship for the cause stated in the decree of the Municipal Court, viz., that for want of discretion in managing her estate she is likely to become chargeable,—the charge of the court being, that, under this act, it might be legally done. The defendant claims that it cannot be. The terms of the statute are broad enough to include every person, who, having the legal power of managing his or her own estate, is, for want of discretion in that manage-

ment, likely to come to want, and be chargeable as a pauper. It is said, however, that the case of a married woman is impliedly excepted out of the act ; and the argument is, that it is inconsistent with the theory of the law,—that being, that the wife is *sub potestate viri;* and that it is not competent for the husband to delegate the custody of her person, or the disposition of her property. It is said, also, that in chancery a guardian will not be appointed over an infant under coverture ; that the right of the guardian appointed before marriage is affected by the right which accrues to the husband upon the marriage, and that, for this reason, the testamentary guardianship determines upon the marriage of the ward. In the cases cited, *Mendes* v. *Mendes,* 1 Ves. Sen. 91, as to testamentary guardians, and in *Roach* v. *Garvan,* 1 Ves. Sen. 160, that guardianship of an infant must cease at the marriage, as well as in the passage in Reeves, on the Domestic Relations, p. 328, the reasons given why such guardianship should not continue are, that, upon the marriage, the husband succeeds to the rightful control of all the property of the ward,— to the right of disposition of the personal estate, and to the possession and pernancy of the profits of the real estate, so that there is nothing for a guardian to control. This reasoning clearly does not reach the case of one who has the power of disposing of her income, to the utter exclusion of all control of the husband. Where the control is exclusively in the husband, it could never be true that the wife, for want of discretion in management, could be wasting her estate. It might be, if the sole power of disposition were in her. There is no case which holds, that where it is found to be true, that she is so wasting her estate, a court of equity will not interfere.

This power, however inconsistent at first view it may appear, is not a new power, though it is here vested in a new jurisdiction. It is one which the Court of Chancery in England has exercised when the interest of the married woman required it. It is said that that court, as the delegate of the crown as *parens patriæ,* had originally the right, not only to the custody of infants, but also of idiots and lunatics ; and that the jurisdiction had a rightful foundation in the prerogative of the crown,—in its general power and duty to protect those who have no other lawful protection ;

and it is said, also, that in every civilized state such a superintendence and protective power does somewhere exist.   2 Story's Eq. Jurisp. § 1333.   This power extends, by construction, to all persons of unsound mind from whatever cause, and includes all who are found, by inquisition, incapable of conducting their own affairs. 3 Bl. Com. 304; 1 Inst. 246.   It is equally the duty of the court to appoint committees for those who have become incapable of managing their affairs, as for those who never had the capacity to do it; and, in *Ex-parte Cranmer*, 12 Ves. 445, it is significantly asked by the Chancellor, why should not a man be entitled to protection in his second state of infancy, as well as in the first? The whole prerogative is, that it falls to the king to take care of those who cannot take care of themselves; and referring to the phrase used by Lord Cooke, he says, " upon this the jurisdiction (which God forbid should not exist) is clear over those who, from sickness, accident, or old age, have lost their understanding." In such case, a writ in the nature of a writ *de lunatico inquirendo* will issue, to enquire if the person is fit for the government of himself and his own affairs; and if the return be that he is not, and is of unsound mind, a committee will be appointed.   Though from the very nature of the subject, cases would seldom arise requiring the exercise of this power in regard to married women, yet the power to proceed by commission against a *feme covert* would seem to be as unquestionable as against a *feme sole*, or other person.   It is recognized as an existing power.   In *Ex-parte Tomlinson*, 1 Ves. & Beames, 57, the Chancellor speaks of an application for a commission against a lady unquestionably lunatic, which was opposed by the husband.   It was refused, not for want of jurisdiction, (that seemed to be admitted,) but because, as he said, he considered that there was nothing which called upon him to interpose.   It did not appear to him necessary for her good to interpose.   In *Brodie.* v. *Barry*, 2 Ves. & Beames, 36, this power is again spoken of as an unquestioned power. That was an application by the husband for an allowance to him, out of the separate estate of the wife, who was *non compos*, and resident in Scotland; and in this case, the Chancellor says, that were she resident in England instead of Scotland, a commission might have issued; and the consideration would then be, whether,

regarding the means of the husband and the extent of the separate estate, an allowance would be proper.  *In re Hewson*, 13 E. L. & Eq. 197, Mrs. Hewson, who was found lunatic in 1845, had a separate estate.  The committee claimed against the husband's executor, moneys received by him out of her separate estate.

It is this power over idiots, lunatics, persons *non compos mentis*, or who, for want of discretion, were incapable of managing their estate, which the legislature proposed to vest in the town councils, (now constituting the courts of probate in the several towns.)  There was, at the time the act was passed, no court of chancery to exercise this power,—a power, it is said, of such absolute necessity, that it would seem strange if, in any civilized community, it did not somewhere exist.

In 1742, the General Assembly, for the first time, legislated upon the subject of the appointment of guardians over the persons or estates of persons other than infants ; and provided for all the cases to which the jurisdiction of the chancery in England had been extended, or which seemed to require a remedy.  The title of the act indicates its general purpose,—" An act empowering the several town councils of this colony to have the care and oversight of all persons who are delirious, distracted, or *non compos mentis*, and their estates."  It enacts, that " it shall be in the power of each town council in this government, to take into their care all persons and their estates, in each respective town, who are delirious, distracted, or *non compos mentis*, or such who, for want of discretion in managing their estates, are likely to bring themselves and families to want and misery, and thereby render themselves and their families chargeable to the respective towns in which such persons live ; and the said town councils are hereby fully empowered to appoint one or more proper person or persons as guardians to such person or persons who now are, or hereafter shall happen to be, delirious, distracted, or *non compos mentis*, or otherwise discomposed as aforesaid, to have the ordering of such person or persons and families, and to improve the rents and profits of their estates, to and for the support of such disordered persons as aforesaid and their families ; and also to act and transact their secular affairs ; and to sue and be sued in the behalf and name of all such person or persons, in as full and

ample order as they themselves could, if *compos mentis*." It will be seen that this act did, in the most ample manner, vest in the town councils, and now does in the several courts of probate, this jurisdiction over all persons who are of unsound mind, and incompetent to manage their estates, exercised by the court of chancery in England, either by its own inherent power, or by delegation of the prerogatives of the crown as *parens patriæ*, to protect those who have no other protector. It is given them for the same purpose,—that the estates of such as have not the capacity to manage them should be managed, improved, taken care of, and applied for their benefit,—the comfortable support of themselves, and of their families if they have any. The act suggests another motive, viz., to save the towns from the burthen of supporting such persons after their estate shall be wasted away. To carry out the purposes for which this power is vested in chancery, and the purposes expressed in, and implied from, this act, it is as necessary that a married woman should be the subject of this jurisdiction, as any other person who is incompetent to manage his or her estate. If this protective power be not exercised, of what avail would it be that property is secured to her sole and separate use, while she has not sufficient discretion to apply it to that use?

It is no objection, as suggested, to the exercise of this power by the court of probate, that *this* court may appoint a trustee of her property. Such an appointment would not prevent her wasting it so long as she had the power to direct the action of the trustee, and to bind her estate in his hands, independently of his will. The trust is created to exclude all power or control of the husband over her estate, but not to restrain her power of disposition. The trust, in such case, answers the purpose for which it was designed, but not the purposes of this act.

Neither is it an objection, as is suggested, to the validity of the decree appointing the guardian in this case, that the complaint and application made to the court did not allege that the husband was unable to support his wife. It must be proved, undoubtedly, in every case, to the satisfaction of the court, that she is likely to become chargeable, and that, for want of discretion to manage her estate; and it may be matter for the consid-

eration of the court, that the husband's means are ample and beyond contingency,—showing that there is no reasonable danger that she will not always be provided for; but it is no picture of the imagination to suppose a husband without such means, nay, himself dependent upon her income for his own support. We must assume that the Municipal Court had proof sufficient to satisfy them, that, for want of discretion in managing her estate, Mrs. Olney's estate was being wasted away, and if totally wasted, there would be nothing to prevent her becoming chargeable. They have so adjudged, and if they had jurisdiction, that judgment is conclusive.

Neither do we think that it is any sufficient objection to the decree, that the guardianship of the property is coupled with the guardianship of the person. It is not necessary, in the exercise of any of the guardian's powers, to invade any of the rights of the husband, either in the disposition and control of the property of the wife, or the custody of her person. Whatever control of her person may be necessary for her protection and for the assertion of her just rights must necessarily be given to the guardian, but this may be, and would be, in subordination to every just right of the husband. The custody of her person would not be taken from him unless for her protection. In the case before us, all idea of an invasion of the husband's right is excluded by the fact, that this proceeding was had upon his application.

Upon the whole, we see no sufficient objection to the validity of the decree of the Municipal Court, appointing a guardian over the person and estate of Mrs. Olney; and must hold, that from the time of the appointment, and while she continued under guardianship, she was incapable of performing any legal act in regard to this promissory note, and that the attempted transfer of the note to the defendant by her was absolutely void, and passed no interest to him. This being so, without considering another point made by the defendant, we must overrule the motion for a new trial, and render judgment upon the verdict, for the plaintiff.